LOVE, SUPERINTENDENT OF BANKS, *v.* LITTLE *et al.*

(En Banc. June 5, 1933. Suggestion of Error Overruled July 7, 1933.)

[148 So. 646. No. 30606.]

106

Flowers, Brown & Hester, of Jackson, and R. R. Norquist, of Yazoo City, for appellant.

Wise & Bridgforth, of Yazoo City, for appellees.

**Anderson, J.**, delivered the opinion of the court.

On December 22, 1930, the Citizens' Bank & Trust Company of Yazoo City, being insolvent, was taken over by appellant for liquidation under our banking laws. The liquidation was proceeding in the chancery court of that county, as required by statute (Code 1930, section 3817). Appellees intervened in that cause by petition and set up their claim against the bank in the sum of nine hundred thirty-nine dollars and eighty-nine cents, which they alleged was a special deposit and a trust fund for which, under the law, they were entitled to payment in full as against other unsecured creditors. The petition was an-

swered by appellant, and its material allegations denied. The cause was tried on the pleadings and on evidence, resulting in a decree granting the prayer of the appellees' petition. From that decree appellant prosecutes this appeal.

Appellee L. Freeman Little is the owner of Willowdale plantation in Yazoo county. The plantation was leased for the year 1930 to appellee J. R. Broadaway, who got his necessary "furnish" for the plantation from W. W. Nevins. The cotton raised on the plantation was sold at various times during the year through the Staple Cotton Cooperative Association of Greenwood. The cotton association, acting under instructions of appellees and Nevins, mailed the checks for the various lots of cotton sold by it to the Citizens' Bank & Trust Company of Yazoo City. The checks were made payable to "L. Freeman Little; J. R. Broadaway, and W. W. Nevins." There were several of these checks, inasmuch as there were several lots of the cotton sold at different times by the cotton association. Acting under authority expressly given it by appellees and Nevins, the Citizens' Bank & Trust Company indorsed these checks of the cotton association "with the names of all three payees" and credited the amounts to "J. R. Broadaway Rent Account." These checks were forwarded by the Citizens' Bank & Trust Company to its correspondents, and the proceeds of their collection went into the Citizens' Bank & Trust Company in the manner stated.

At the time appellant took charge of the Citizens' Bank & Trust Company there was in the "J. R. Broadaway Rent Account" the sum of nine hundred thirty-nine dollars and eighty-nine cents. Appellee Little asserted his preference claim against the assets of the bank in the sum of six hundred dollars, which he alleged was the amount of rent due him for the plantation for the year 1930, and appellee Broadaway set up a like claim for

the balance, three hundred thirty-nine dollars and eighty-nine cents.

For two or three years prior to 1930 this same arrangement had been made by appellees for the handling of the plantation. J. P. Bennett was vice-president of the Citizens' Bank & Trust Company. He testified, and we understand the evidence was undisputed, that the bank would receive from the cotton association its checks representing the proceeds of the sale of cotton raised by Broadaway on Little's plantation; that by agreement of all the parties this money would be held by the bank, and, when all the cotton had been sold and the proceeds in, the bank would remit to Little the rent for the plantation for the year, after paying his taxes, and the balance would be turned over to Broadaway. The arrangement meant that neither one of the interested parties could check out his share of the deposit. On the contrary, the bank was commissioned by all the parties to dispose of it in the manner above stated.

The question is whether or not this fund so deposited and handled became a special deposit and a trust fund for the payment of which appellees are entitled to a preference out of the assets of the bank. The chancellor so held, but we think his holding was erroneous for the following reasons: A deposit is presumed to be general unless expressly made special or specific. Where the bank had a right to mingle the funds deposited with its general assets, it is a general deposit and not a special one. A special deposit does not enter into the general funds of the bank "and form a part of its disposable capital;" it is kept separate and is to be specifically returned. This is true, even though the money deposited may be trust funds put with the bank on condition that it would pay a certain sum to the cestui during life, in the absence of evidence to show that it was the bank's duty by express agreement or clearly implied to keep the

funds and their investment separate. 1 Morse on Banks & Banking (6 Ed.), sections 186 and 205, and case notes.

However, it appears unnecessary to refer to authorities elsewhere to sustain appellant's position. The cases of Billingsley v. Pollock, 69 Miss. 759, 13 So. 828, 30 Am. St. Rep. 585; Love v. Federal Land Bank, 157 Miss. 52, 127 So. 720; and Love, Supt. of Banks, v. Fulton Iron Works, 162 Miss. 890, 140 So. 528, although not directly in point on their facts, lay down principles which sustain appellant's contention.

Appellees, to sustain their contention, rely on Armour-Cudahy Packing Co. v. First National Bank, 69 Miss. 700, 11 So. 28; Sawyers v. Conner, 114 Miss. 363, 75 So. 131, L. R. A. 1918A, 61, Ann. Cas. 1918B, 388; and Love v. Meridian Grain & Elevator Co., 162 Miss. 773, 139 So. 857. In the Armour-Cudahy case the deposit was made by its agent Lamon in the bank with the distinct understanding that it belonged to the packing company, and that the bank should promptly remit the funds to it. Opposite the deposit on Lamon's passbook was the word "meat;" this was to indicate that the deposit was the proceeds of the sale of meat by the company. The court held that the deposit was a trust fund; that under the facts the bank had no right to commingle it with its general assets; that it held the deposit for a definite and specific purpose, and could appropriate it to no other.

In the Sawyers case the depositor refused to permit the proceeds of a check to be deposited either to her checking account or her savings account, but informed the cashier of the bank that the deposit was for the purpose of paying a contractor for building a house, whereupon the cashier gave her a special receipt bearing the words "S. P. Dept." The court held that the deposit was charged with a trust in favor of the contractor, and that the bank did not get title to the proceeds of the deposit.

In the Meridian Grain & Elevator Company case there was printed on the draft that it was a cash item and was not to be treated as a deposit, and that the funds obtained through its collection should not be accounted for to the drawer or commingled with other funds of the collecting bank. The court held that thereby the bank had notice that the drawer did not intend that the draft or proceeds thereof should be handled by the bank, except as drawer's agent, and that such agency should continue from the time the bank received the draft for collection until the money was paid to the drawer.

There was no evidence either directly or circumstantially tending to show that it was understood that the Citizens' Bank & Trust Company would hold these funds in trust—that they were not to be commingled with the general assets of the bank. On the contrary, the evidence shows that the bank held the funds as a mere debtor. The result of these views is that the decree of the lower court is reversed, and a decree is entered here for the appellant.

Reversed, and decree here.

**Ethridge, J.,** delivered a dissenting opinion.

I think the fund here involved is, clearly, a trust fund. J. R. Broadaway leased a plantation from L. Freeman Little, and was furnished by W. W. Nevins with money and supplies to operate same, it being understood between Broadaway, Little and Nevins that the cotton produced on the plantation would be sold to the Staple Cotton Co-Operative Association, and the check would be made payable to these parties jointly, Broadaway, Little, and Nevins being named therein as payees. It was further agreed that the Citizens' Bank & Trust Company of Yazoo City, Mississippi, would be the custodian

of the check, and that it would hold the funds until an agreement was reached between the parties as to the amounts to be paid to each.

The check involved in this suit amounted to something over one thousand five hundred dollars, and the bank had authority to indorse by signing the name of the payees thereto, which it did and collected same.

Thereafter, Broadaway secured the consent of Nevins to use all the funds, except that due to Little for rent of the plantation. Broadaway applied to the bank for the funds, above the amount due to Little for rent, and the bank refused to pay such funds to him. Little had directed the bank to act as his agent for the collection of rent due him, and to pay his taxes due to Yazoo county, he being a nonresident, and to remit the balance to him.

The bank deposited the check when indorsed to an account it carried on its books as "J. R. Broadaway Rent Account." Of course this entry on the books did not give any person the right to draw against this account. The cashier of the bank, in explaining the purpose of this entry, testified as follows:

"Q. When you put the money in the account of J. R. Broadaway rent account, what was your purpose in doing that? A. To keep Mr. Broadaway from checking against it in case he attempted to. In other words, if Mr. Broadaway gave a check on our bank, we could turn it down because he had no funds in his account.

"Q. It was your idea that you would thereby protect Mr. L. Freeman Little in his rent, and would also protect Mr. Nevins in his furnish, that was your purpose? A. Yes, sir.

"Q. In that account? A. Yes, sir, that is right.

"Q. What was your intent in regard to the disbursement of that account after opening it up? A. You mean the J. R. Broadaway rent account?

"Q. Yes. A. To pay Mr. Little the six hundred dollars and pay the balance to Mr. Nevins.

"Q. Where you authorized to collect Mr. Nevins furnish account? Did you have Mr. Nevins' authorization to collect the furnish account owed him by Broadaway? A. My instructions from Mr. Nevins were to endorse the checks for him and see that wouldn't any of the money get away without his knowledge, to hold it there.

"Q. And except for the six hundred dollars (furnish to Broadaway R 20) approximately none of it did get away? A. None of it, no sir, and that was released at Mr. Nevins' request."

As stated above, Little lived in Kentucky, and is not shown to have carried any account with the bank at all, but he instructed the bank to first pay his taxes, after collecting his rent, and then remit him the balance.

The bank, under these circumstances, had no right to convert the money belonging to these parties to itself. None of them had authorized the bank to deposit the funds due them, or to make the bank a debtor to them. Broadaway attempted to have his part, something over three hundred dollars, with the consent of Mr. Nevins, deposited to his (Broadaway) account, so that he could check against it, and the bank refused to do this, showing clearly that the bank regarded the matter as one of principal and agent, rather than debtor and creditor. The bank had attempted to pay Little's taxes, but the sheriff was not then ready to receive taxes, and nothing more was done about it. There were sufficient funds in the bank at all times, from collection of checks, to have paid the entire amount of these funds.

It is difficult to see where any relation of debtor and creditor existed. The bank was the agent of these three parties to collect and hold the money until the three agreed how it should be disbursed. Under this agree-

ment, none of the parties had the right to withdraw, to the prejudice of the others, any of the funds.

In Morton v. Woolery, 48 N. D. 1132, 189 N. W. 232, 24 A. L. R. 1107, the Supreme Court of North Dakota announced the rule as follows: "Where a person makes a deposit in a bank for the specific purpose of meeting certain checks to be thereafter issued, the bank, on accepting the deposit, becomes bound by the conditions imposed, and if the money so deposited is misapplied, it can be recovered as a trust deposit." This was a well-reasoned opinion and shows that, where money is placed in a bank, not in the ordinary course of deposits, but to accomplish a specified purpose, the bank must hold the funds for that purpose. On page 1111 of 24 A. L. R., there is a learned case note: "Where there is a deposit in a bank for the purpose of meeting certain checks, or classes of checks, it is generally held that the money thus deposited must be applied to the purposes for which it was deposited; it cannot be diverted therefrom. [Citing authorities.] If a bank receives a deposit for a special purpose, it cannot divert the deposit to other purposes. Union Trust & Savings Bank v. Southern Traction Co. [C. C. A!.], 283 Fed. 50." See full text of case note.

In Bank of Hickory v. McPherson, 102 Miss. 852, 59 So. 934, it was held that, where a commissioner sells land in partition, and obtains a check from the purchaser payable to him as commissioner, the check, on its face, showed that it did not belong to such person individually, and a bank crediting the proceeds to him individually was liable to the beneficiaries for a misappropriation of the proceeds.

In Ladner v. Ladner, 128 Miss. 75, 90 So. 593, it was held that, where one makes a time deposit in a savings bank, informing the cashier at the time that he desires to place this money in the bank in the name of another party, but so that he (the depositor) can draw

the interest while he lives, and that he wishes the money to go to the other person at his death, the facts and circumstances show it was the intention of the depositor to, and that he did, create a perfected parol trust in this fund; the beneficiary thereof being the other person whose name appears upon the deposit slip.

I think, therefore, that the chancellor was correct in holding the funds, in the case before us, to be trust funds, and to be preferred over the ordinary debts of the bank.